# THE JOLIET, AURORA & NORTHERN RAILWAY COMPANY

## v.

# A. A. VELIE.

*Railroads—Personal Injuries — Defective Appliances — Contributory Negligence—Evidence—Question for the Jury—Excessive Damages.*

1. In an action against a railroad company for personal injuries, it is held that the questions of negligence and contributory negligence were for the jury.
2. It is also held that a verdict of $14,000 for the plaintiff was not excessive.

[Opinion filed May 28, 1890.]

APPEAL from the Circuit Court of Kane County; the Hon. ISAAC G. WILSON, Judge, presiding.

This action was brought by the appellee to recover damages for personal injuries received by being run over by the engine of the appellant while in its employ as conductor and acting brakeman, while in the line of his duty in uncoupling the engine from the freight cars. The gravamen of the action is the alleged negligence of appellant in various particulars set out in the declaration, all but one of which we deem it unnecessary to notice, as in the view we take of the case there was no evidence that any of those acts of negligence, save the one which we will notice, was the proximate cause, or cause in a legal sense, of the injury complained of.

The allegation of negligence set out in the declaration, upon which the right of recovery if sustained by the proof alone hinges, is as follows: That it was appellant's duty to have on each car of the trains an appliance, commonly called a hand-rail, in good repair, to reasonably protect employes engaged in operating trains, and also to furnish employes to inspect cars and see before they were permitted to run over the said

road that they were provided with proper appliances to protect employes handling such cars. The foregoing are the only material allegations that, we think, the evidence could by any consideration of the law in such cases sustain. The circumstances of the accident or injury and the surroundings, as shown by the evidence, seem to be about as follows: The appellant's road was about forty miles long, extending from Joliet to Aurora, Ill.; the track laying was finished, but the blasting and surfacing had not been completed, and work on them continued till after the accident and until May, 1889. The road owned no equipment except one locomotive and one combination passenger and baggage car; its business was in the transfer of freight cars from other roads between Joliet and Aurora, with such incidental passenger traffic as might happen to arise. The appellee was employed by the appellant through its superintendent, Evans, as conductor, at $75 per month, commencing August 17, 1886. His business was to run a mixed train consisting of freight and passenger coaches between Joliet and Aurora, making two trips a day each way, his being the only train on the road. There was no turntable at Aurora, and this necessitated running the engine backward from Joliet to Aurora, or from Aurora to Joliet. The only railroad employe at Aurora was a station agent who had nothing to do with making up the train, only to tell appellee and his brakeman what cars were to go. The appellant had no yard at Joliet at the time of the injury. The Chicago and Alton R. R. Co. did the switching. It made up the trains and appellee and his brakemen would couple on with the engine. Appellee was the first of appellant's men who had anything to do with the cars. The train was made up for them from cars brought from other roads to take out. Appellee had nothing to do in making up the trains at Joliet; that was done by the Chicago & Alton R. R. Co., which did all the terminal work in every shape and manner, including the making up of trains. Appellee's orders were to go and get the bills and take his trains. The train crew with appellee consisted of his engineer and fireman and one brakeman. The engine that hauled the train April 22, 1887, the time of the

accident, was provided with a foot rest on the right side, but none on the left side of the pilot or cow catcher. At Plainfield, a station between the two terminal points of the road, there were two side tracks, one on each side of the road. It was appellee's practice to do all the switching at Plainfield, because most convenient. On the afternoon of April 22, 1887, appellee as usual left Aurora on his return trip to Joliet at about 4:15 o'clock P. M., with three freight cars and a combination coach.

The engine was backing toward Joliet with its nose or pilot against the foremost freight car. This car belonged to the Hoosac Tunnel Line No. 8221; it had previously come over appellant's line from Joliet some time before the accident, loaded with coal. At Plainfield it was desired to rearrange the train.

In the operation No. 8221 was to be temporarily detached from the engine and backed in on the side track, to be afterward hauled out in a different position to the other cars. The engine accordingly pushed the car back onto the switch at the south side of the main track, and when it had gone far enough, appellee stepped between the car and engine to draw the coupling pin and allow the engine to return to the main track, and his own account of the occurrence is as follows: "As the cars passed me I looked to see that everything was all right, and I saw that everything was all proper and as it should be, and I stepped up to cut the car off. I had to look to see where I was going, so as not to stumble when I went to uncouple, and as I reached for the hand-rail on the car, my hand fell down from it; that threw me off my balance; then the pilot got me on the ankle and shoved me along on the rail." "I was taking all the care I could." "This rail was not in good condition; it was not in proper shape, because I put my hand out to get hold of it, and it was flattened in so that I could not grasp it. If it had been in proper shape there would have been no trouble at all about my grasping it. It was smashed in close against the car. It looked all right, was not bent down, but was smashed against the car. I reached for it, but could not get my hand on it,

and so lost my balance and went down." On cross-examination he testified: "The train, when I fell, was on the side track. When I fell, I was just stepping over the rail to reach for the car. My foot was on the ties and I was looking to see where I was stepping. I think my stepping over the rail and reaching out my hand were simultaneous, and when I failed to grasp it, my hand fell down and I lost my balance. If the hand-rail had been in sound condition, I do not think the accident would have happened."

The evidence abundantly shows that the hand-rail was out of repair and in such a condition that it could not be grasped by a man's hand, so close was it jammed in against the car, and that the defect appeared to have been there some time. This hand-rail was about five feet above the ground.

As to the hands furnished appellee and equipment, he testified as follows, viz.:

"On the day I was injured I was handling four cars—three freight cars and a combination baggage and passenger coach. I had one brakeman, a fireman and an engineer. To do the business that we were doing I ought to have had two or three men where they furnished me one. That one was a brakeman who had not been railroading any length of time. There should have been one brakeman and one man to attend to the baggage. I had, several times prior to the accident, called the attention of the superintendent to the fact that I needed more help. He had promised me that in a few days they would give me a man, as soon as business would pick up a little. I said, 'What more business do you want than we are doing; there are not men enough to do the work now. 'Well,' he said, 'I will give you a man after a little.'

"Not having that man compelled me to do brakeman's work to get along and make time. I had to couple and uncouple cars, as a brakeman would do. The extra man had not been furnished when I was hurt. The first time I got out after I was hurt was in September, and they had two brakemen there then."

The injury received by appellant was very severe; the flesh on the leg was shoved up and pushed back so that the

bone stuck out, and the foot was crushed. He was crushed in the chest and the ribs were torn loose from the breast bone. He has suffered amputation four different times. The ribs have never been united and are yet loose from the breast bone. He is incapacitated from ever doing any labor, and has suffered great pain. He is, in fact, a perfect wreck, his nervous system is so shattered.

At the close of appellee's evidence, the appellant made a motion to have the evidence introduced excluded from the jury, which the court overruled, and appellant excepted.

The jury returned a verdict against appellant for the sum of $14,000. The appellant made a motion for a new trial, which was overruled by the court, and judgment rendered on the verdict, from which judgment this appeal is taken.

Messrs. WILLIAMS, HOLT & WHEELER, and M. O. SOUTHWORTH, for appellant.

Messrs. A. J. HOPKINS, N. J. ALDRICH and F. H. THATCHER, for appellee.

LACEY, J. The only points which the appellant insists upon as error, are, first, the court overruled its motion to take the case from the jury, and, second, in overruling the motion for a new trial on the ground that the verdict was contrary to the evidence and not supported thereby.

It is not seriously contended that appellee was not in the exercise of ordinary care at the time of the injury, but it is insisted that he entered and continued in the service of the appellant after knowing all the defects in the appliances and machinery and dangers in the requirements of the service which he engaged to perform and therefore took the risk of all accidents and injuries arising to himself on account of any such known defects. And it is contended that by reasonable care and diligence he might have been informed of such defects and dangers and is, therefore, held to notice. This is undoubtedly the law and should be kept in mind in determining the right of the jury to return a verdict against the

appellant, although no strictly legal question is raised by any instruction. See Penn. Co. v. Lynch, 90 Ill. 333. It is contended by appellee's counsel that a case should not be taken from the jury where there is any evidence tending to establish the allegations of the declaration. This is no doubt the law, provided the court can say that the evidence reasonably authorizes the jury to find the issues in the direction in which the proof tends. If the trial court would feel bound to set aside the verdict then the proof is not sufficient. Simmons v. C. & T. R. R. Co., 110 Ill. 340. It is no doubt the duty of a brakeman and others having charge of a train to inspect it and see that the cars are in good running order and everything in repair to the same extent that it is the duty of the company so to do. C. & A. R. R. Co. v. Bragonier, 119 Ill. 51; C., B. & Q. R. R. Co. v. Warner, 123 Ill. 38; Same v. Same, 108 Ill. 538.

It is the rule of law also, that "it is primarily the duty of the company to provide good, safe and proper machinery so far as skill and diligence can construct it; but when that duty has been once performed it is a duty devolving on the servants operating it to observe that it is in safe repair," etc. C. & A. R. R. Co. v. Bragonier, *supra.* The above, we think, is a reasonable statement of the law, which must be considered in determining whether the evidence reasonably supports the verdict after allowing the jury every intendment in its favor.

We will now consider the evidence as bearing upon the point we regard as the vital one. In the first place, we will premise by saying that we can not regard the failure of appellant to furnish other brakemen as the cause of the injury. That fact may have been the cause of the appellee being compelled to do braking at all, but the fact that he did the coupling and braking did not reasonably imply injury, no more than would the fact that appellee was in the appellant's employment. It may have been the cause of the cause, but in law can not stand for the cause of the injury. The fact that there was no step on the left hand side of the pilot can not be allowed to assist plaintiff to recover. For, first, that did not appear to be the cause of the accident, and,

secondly, if it had anything to do with it, it was as well known to the appellee as anything could be, for he had run the engine for several months. We are well satisfied that the evidence justified the jury in finding that the hand-rail being out of repair and mashed in was the cause of the injury. We also are of the opinion that the jury were justified in finding from the evidence that such an appliance, kept in good order, was reasonably necessary in order to prevent injury to those operating the train, and that it was usual to attach them to cars and that the appellant was negligent in not having the hand-rail in good repair. We can not see, either, why this defect might not be considered by the jury in the light of a defect, the same as though the car had been made by the appellant without any hand-rail or with one improperly constructed; for it appears that the car came into appellant's hands in the shape it was, or, at least, the evidence so tends to prove, and it would be the same as though purchased for its own use. At any rate, the jury were justified in holding it was negligent in not giving the car the necessary inspection, and in not repairing it. As to appellee having notice or being held to notice, we will observe that he had no notice of the defect and had no notice that appellant had no inspector of cars, but thought it had. We do not think the appellee can be said to have been in service of the appellant with knowledge that it was receiving cars in bad repair and dangerous to life and limb. The C. & A. R. R. Co. acted for appellant in receiving the cars at Joliet and making up the train, and we think the jury might find from the evidence that it had the duty of inspection as well. When the cars were hauled by appellee to Joliet, the train being made up, it was not necessary to examine the cars to find whether the hand-rails were all right. All he had to do was to couple on his engine and haul them to Aurora and there leave them, and when, afterward, he took them back again, he had no occasion to examine them till he reached Plainfield. Besides, when he started from Aurora he had the baggage to look after, and other duties of the conductor, and it may be that the brakeman coupled the cars. The jury had a right to take all the

circumstances and the position of appellee into account in determining whether he was so negligent in his duties as that he should be held to knowledge of the defective hand-rail. It does not follow, as a conclusive fact, that appellee should be held to notice of the defective hand-rail because the car was in his charge, though there are some strong expressions in the opinion in C. & A. R. R. Co. v. Bragonier, *supra*, that might lead one so to suppose. We do not think that the court there so held. It was treating of certain instructions held to be erroneous. And it is quite clear that it was not so intended when C., B. & Q. R. R. Co. v. Warner, *supra*, is considered, for in that case Warner was conductor of a freight train, a part of his duties being coupling and uncoupling, and, though his injury was caused by reason of the want of a hand-rail on one of the cars in his train, the jury returned a verdict in his favor, and it was upheld by the Appellate and Supreme Courts.

This could not have been if the mere fact of his having charge of the train held him to notice of the want of the hand-rail.

The jury must have found, under the circumstances, that he was not negligent in not discovering the defective hand-rail, for this was submitted by instructions and was necessarily involved. In this case we think the jury had far better reason for finding their verdict, acquitting appellee of negligence, than in the other. All the questions of fact have been submitted to the jury and we fail to find, after a careful review of the evidence and full consideration of the arguments, that it was not justified, or that the court erred in not taking the case from the jury on appellant's motion.

We have also considered the objection that the verdict is excessive and are compelled to also hold that point against appellant. While it appears on the one side quite a hardship on appellant's part to be compelled to pay so large a sum for what its counsel appears to consider a trifling fault, yet when we consider the hopeless and forlorn condition of appellee, his hardship seems much greater. It only illustrates how great calamities result from trifling causes. Hundreds may

be killed on account of the omission of watchfulness and care, and we see no better way than to hold the guilty party responsible for its lack of duty. The appellant's road was no doubt weak and poor, as it appears to have been run on too economical a principle for safety to its employes and to the public. The loss, where the employes are not in fault, should fall on the party in fault.

We can not think that the amount is more than just compensation. Appellee was a man in the prime of life, only about forty-five years old, capable and efficient in his occupation, and could command a good salary. He had been employed not long before for $100 per month and appeared to have bright prospects before him. Then, if he is to be allowed compensation for any pain and suffering, which the evidence shows was intense and of long duration, we can not see wherein he has been over-compensated. Seeing no error, the judgment of the court below is affirmed.

*Judgment affirmed.*

SMITH, J., dissenting. I can not give my consent to this judgment, for three reasons:

First. From the appellee's own statement, he was guilty of gross negligence in stepping between the engine and the car while it was in motion to uncouple them, and that, too, upon a road which was unballasted, and when he could not walk without stepping upon or between the railroad ties that had no filling between them. It would be difficult to imagine a more dangerous or reckless act than stepping before a moving engine to uncouple the car to which it was attached. It was also an act of negligence on the part of appellee in not looking to see whether there was a hand-rail attached to the freight car before reaching for such rail. If he had given the slightest attention to his protection, he would have seen the rail was out of order and that he could not get hold of it.

The Supreme Court and this court have held, in a multitude of cases, that an attempt to get off a moving train is such an act of negligence as will prevent a recovery when accident follows such attempt, and how much greater was the neg-

ligence on the part of appellee to step before a moving engine when the slightest misstep would involve him in almost certain death. It is hard to imagine a more reckless act of an intelligent human being. The law does not require railroad companies to send or keep a guard or watchman over its employes to guard them from getting hurt. Every person in the employ of a railroad company, from the highest to the lowest, are but servants in the service of an intangible lifeless thing, called a corporation, and, therefore, from very necessity, every servant must be watchful and careful for his own safety, and must not expose himself recklessly to any kind of danger. The enforcement of this rule is of the highest importance to employes in railroad companies, and also to the public, whose lives and property so largely depend upon the watchfulness and care of those operating the railways of the country.

In this case, appellee was the master of his own train. He had a right to require the engineer to stop his engine before going before it. No one had a right to command him to go into a place of danger, nor was there the least possible necessity of his going before a moving engine to do this work he was doing. It was purely voluntary on his part and wholly unnecessary. The danger was apparent to the most thoughtless, and in the presence of this known danger he did not so much as raise his eyes to see whether there was any guard rail on the car which he could reach or hold to while uncoupling the car. I can not imagine any greater degree of negligence, short of throwing one's self headlong before a moving train.

Second. If the methods adopted for running appellant's train were dangerous and hazardous to its employes, either from a want of sufficient help or from a new or bad road track, or from dangerous machinery, and with a full knowledge of these dangers and hazards the appellee remained in the service of the company, then, under the settled and repeated decisions of this and the Supreme Court, he could not recover for an injury resulting from such dangerous methods of operating the road, or from an insufficient road or defective machinery.

If he saw fit to continue in the service of the company with insufficient help, a defective road or machinery, and under

methods of operating his train that were manifestly danger-
ous and hazardous, then he must be held to have assumed the
risks of continuing in such place of danger.    This rule is so
well settled that it needs no citation of authorities.

Third.    I hold the damages are excessive in the extreme.
While there is no doubt that the injury to appellee was very
severe and lasting in its character, and that he has suffered
very greatly and is maimed for life, still, I am constrained to
believe that the verdict is largely the product of sympathy on
the part of the jury for the appellee.    The amount only lacks one
hundred dollars of being three times as much as the law allows
to be recovered for the death of the most useful or exalted
citizen of the State.    The interest on this amount at the cur-
rent rate of eight per cent per annum, amounts to $1,120, and
leaves the principal untouched.    This is $220 more per annum
than appellee was earning at the time of this injury.    It seems
to me that sympathy for this worthy and unfortunate man has
blinded both the court and jury to plainest principles of law,
rightly applicable to and governing the case, and that this ver-
dict has no support either in the evidence or the law.